Attorney Pogge is here on behalf of the appellant, and are we reviewing the whole argument Ms. Pogge? Yes. Alright. And for the accolade, Attorney Jackson? Yes. Alright. Alright. Ms. Pogge, you may begin. Thank you. May it please the Court, Counsel, the overriding issue in this case I believe is one of first impression. The question is whether the Uniform Commercial Code and the law of conversion permit a purchased money secured creditor to dispose of the collateral inventory proceeds of a prior secured creditor without its knowledge or consent. Prairie State is asking that this Court answer that question no, and reverse the trial court judgment in this case. And then what? I'm sorry, Your Honor? And then what? An inter-judgment in favor of Prairie State.  $299,333.51, Your Honor. And that's what, the outstanding loan? No, Your Honor, that is actually less than the outstanding loan, because I believe we are only allowed the lesser of the two. And what about, it seems to me as if there were some inventory issues here regarding what belonged to who, and who bought it when, and where it came from. No, Your Honor, I don't believe there are any. Well, I thought there was furniture that was supplied by another supplier that was totally separate from anything that the bank had anything to do with. Your Honor, the bank had a Uniform Commercial Code financing statement and security interest in all of the inventory in this case, even the purchased money. The only issue with regard to the purchased money and Prairie State's was, who had priority in the purchased money? The purchased money was paid in full. No money was distributed to anybody else until after the purchased money security interest was paid in full. And Mr. Gladman, defendant's president, testified to that fact. That was paid in full. Once that happened, it was all of Prairie State's. Prairie State had a lean on everything. I think that's part of the problem in the cases that the trial court thought that it was two separate things, but it's not. It's only an issue of priority, and Prairie State was never attacking the purchased money interest of Deer Park. We were never trying to go after any of the proceeds they paid themselves on the purchased money. Okay. The judgment should be reversed for three reasons. Number one, contributory negligence is not, as the court found, is not a defense to the intentional tort of conversion. Number two- Say that again. Contributory negligence is what? Is not a defense to an intentional tort, and conversion is an intentional tort under the Thevis case, I believe said it's an intentional tort. And that's black letter law in Illinois. And number two, the manifest way to the evidence in this case shows that Just Sofa was actually in default, and therefore Prairie State was entitled to possession of the proceeds at all times during the sales in this case. And the third issue is the court said that the bank didn't prove its damages because it didn't prove the value of the inventory. The value of the inventory is not the proper measure of damages in this case. The proper measure of damages is the amount of collateral inventory proceeds that Deer Park distributed to entities having an interest inferior to that of Prairie State. Can I talk to you about your second point? You said, and in your brief it's at page 38, you said Just Sofas was in default and was entitled to immediate possession of the proceeds of the sale. Prairie State was, yes. Prairie State was, yes. That's what I meant. And Prairie State was entitled to immediate possession. Yes. But what steps did Prairie State take at that point to take possession of the proceeds of the sale? The problem is, Your Honor, is that the default in this case was one Prairie State didn't know about. And that's the problem. The security agreement in this case says, I will be in default if I fail to keep any promise in this agreement. It doesn't say you have to declare a default. It doesn't say you have to know of a default. It says, I will be in default if I fail to do any of these things. Right. But that's kind of normal. Yes. But then ordinarily, the person who's on the other end would declare a default and say, look, you're in default, you've entered into this side agreement or whatever the default is. They always made their payments. I understand that. Yes. That wasn't the default. But then they didn't declare a default and they didn't take steps to take possession of the proceeds of the sale that they had the right to do. Because we didn't know about the default, Your Honor. That's the problem in this case, is neither Deer Park nor Jess Sofas made any effort to tell Prairie State about Deer Park's part in these sales. Deer Park sent a notice. It sent a purchase money notice, Your Honor. That's a very different thing than sending a notice about what they were going to do. But didn't they have their consulting agreement attached to that? No, Your Honor. They did not. They referred to it, though. Well, it said, if you've read the UCC financing statement, it's, a lot of it's Deer Rich. And there's not, I mean, at one point the consulting agreement's referred to a consulting agreement. And consulting agreement, the common definition of consulting is, all we're going to do is give you advice. Well, Deer Park did way more than give advice in this case. If all Deer Park had done was take a purchase money security interest, if that's all they had done, they wouldn't have needed to do anything more. Just like Prairie State didn't need to do anything more if all it did was have a security interest. If Prairie State had gone in after Deer Park sent the purchase money notice and shut Just Sofa's down and said, we're taking all your stuff, and they had taken the purchase money and sold it and taken the proceeds and not given it to Deer Park, the situation would be reversed in this case. The thing that Deer Park did and what caused the default was that it took, as a secure competitor, not as a consultant, all of the sale proceeds into its sole possession and control, and it distributed them out to people that had an inferior interest to Prairie State. That's the default in this case, and Prairie State didn't know about it. Okay. Now, what about the fact that Prairie State, it seems to me just from my gathering, reading the briefs and the appendices that were submitted, Prairie State wasn't involved much in inventory financing. They didn't really know what they should be doing, it seemed to me, or at least this new banker they hired certainly didn't seem to stay on top of the case. But Your Honor, you're talking about failure to monitor, and that's what the court found, the trial court found. You made a bad loan, you didn't properly monitor it, waiver, and it found, based on that, that Prairie State waived its security interest. You can't waive your security interest by being negligent. I mean, if I parked my car and left the keys in it, and a thief comes along and takes it, they can't argue that I was negligent and silly for leaving my keys in the car. They're still guilty of criminal conversion. Well, this is civil conversion. Deer Park knew about our security interest. They had both actual and record notice, and they went ahead, took all of our collateral inventory proceeds into their sole possession and control. They were not acting as an agent of Just Sofa's. They were acting as a secured creditor, and they admitted that at trial. That provision was in the consulting agreement so that they could protect their purchase money security interest. Was there a bench trial in this case? Yes, Your Honor. It was solely a bench trial. How long? It was three days, I believe, if memory serves. Did all the principals testify here? Yes. The principals. Mr. Gladman testified. Prairie State had its president. It had several people testify. The only Just Sofas, nobody from Just Sofas, but the Just Sofas fellows somewhere in North Carolina. Not even in the state anymore. Judge Gladman heard all this testimony, and then he wrote up a six-page, single-spaced order making various findings and conclusions? Yes, he did, Your Honor. Yes, he did. And one of those is that your client sat on its rights and didn't seek to take steps that were appropriate? The problem, Your Honor, is we did not know that our rights were being violated. Isn't that a question of fact? And by reaching the decision he did, didn't he find that you knew or should have known what you needed to do in order to avoid sitting on your rights and failing to take any action? He didn't find that we knew. He found that we were negligent in not figuring it out. But that's why we didn't figure out that they were taking our stuff. The consulting agreement between Deer Park and Just Sofas specifically provided that the parties would keep their dealings confidential. Neither Just Sofas nor Deer Park informed Prairie State that Deer Park was involved in the sales. All we knew was that they had a purchase money security interest. And there was testimony that addressed this. We get purchase money notices. Counsel, I keep asking, keep referring back, all you knew, if that's all you knew, Judge Diamond wouldn't have made the ruling he did, would he? Yes, Your Honor, that's precisely what he did. In fact, he made a finding that, he pretty much made a finding, that is all we knew. He said we should have called when we got the purchase money notice. But that's, I mean, I don't think under the law of conversion it requires you to figure out that somebody's taking your stuff. There is nothing in that purchase money notice, nothing, that indicates that Deer Park is going to participate in the sales and that they are going to take, most importantly, that they are going to take sole possession of the collateral inventory proceeds. There's nothing in there. The sale notices. What about the paragraph 44, his citing of the case that he thought best summed up this case? Floating lien creditor can now complain that the notice isn't sufficient when it, like an ostrich, squats and buries its head in the sand when nature approaches merely assert its first security position and then took no further action to protect itself. Is any citing, he says this pretty well sums it up, took no further action to protect yourself when you could have and should have? No, Your Honor. The case, that was a bankruptcy case. We understand that. The language, however. This explains his conclusion, though, doesn't it? It's taken out of context, though, Your Honor. The only issue, and the court in that case, I know the one you're talking about, the Southern Vermont case, the court in that case twice said the only issue is who has priority, the purchase money lien holder or the prior or the floating lien holder. And the court found that the purchase money lien holder had priority. We're not arguing about who's got priority in this case. We're saying the purchase money was paid in full, then it was all ours. In that Southern Vermont case, what happened was the debtor filed bankruptcy, the purchase money secured creditor filed a motion to lift the stay saying we've got our purchase money identified and we want to take it, and the floating lien creditor said, no, no, no, your purchase money notice was defective. It wasn't complete enough. The court looked at the purchase money notice and said, yes, it was. It wasn't an issue of the purchase money lender taking possession of the collateral inventory proceeds and distributing them out without the knowledge. That wasn't at all the issue in this case. That is an excellent argument if this court believed that that case was a precedent. It seems to me that Judge Diamond was not relying upon that as a precedent. He was using it to express his detailed findings of the failures of the bank to act when it knew or should have known. He was saying, and I understand you don't agree with it, he's saying, contributory negligence, okay, that's out. But if you are this uninvolved, which is how he viewed it apparently, that accumulates and it accumulates to the point where I'm finding waiver. I'm not going to enforce this right that you have because you have waived your right to do so. Now, maybe that's the part that's the first impression. What's wrong with his finding? Where did he go wrong? Because, Your Honor, Waiver, he did not find Prairie State new. I mean, I think he found Prairie State didn't know. He just found they should have known. They should have figured out what was going on. And there is not one bit of testimony that indicates that Prairie State knew. In fact, the court commented that Deer Park said once it sends its purchase money notice, it's all done. It doesn't have to communicate. He said there was a total lack of communication between the parties. That's true. It was incumbent upon them. They were the ones doing something with our collateral. If we had gone in and taken over, then the burden would have been on us. The burden under the Uniform Commercial Code, that's why you have a financing statement. Because bankers are not perfect and borrowers don't always tell the truth. That's why you have the financing statements is to let everybody know. All Deer Park would have had to do is say, we're taking your stuff. They didn't even tell Prairie State. And there was nothing anywhere to indicate that JustSelfers was doing anything other than what it was allowed to do under the terms of the security agreement, which was sell inventory. If I were sitting there as a trial judge, I'd begin to wonder when you told them, you don't need a store in Lincoln, or Bloomington, or the second store. You don't need that. No, that's not good. But they go ahead and open the store there anyway. And then later, you find out through the grapevine, they have a store in Lincoln, and they're having a sale there. And then there's some contact with Clouser, who doesn't present the best example of a business person, who says, yeah, yeah, yeah, we're doing that, but we're going to keep our business going in Decatur. How much notice do you need that something hinky is going on? But Your Honor, he's supposed to be selling inventory. And there's testimony at trial. He's failing at the business that you told him not to open. That's why that store is closing. And understanding the sale of inventory would be part of that closing. But doesn't that put you in a position to be deemed insecure, and you've got to jump up and find out what's going on? I mean, I'm asking this from the perspective of how the trial court must have been viewing it. I understand that. I understand that, Your Honor, and I understand that. The trial court was saying we were negligent. That's what the trial court was saying. But waiver is a knowing, has to be knowing. You have to take some decisive act to waive a security interest. Section 9205 of the Uniform Commercial Code actually covers this situation. It says that the fact that the secured creditor allows the debtor to sell the inventory, doesn't make them account for the proceeds, doesn't make them replace the collateral, doesn't mean they waive their security interest. And that Fonz case addressed precisely that. That was in the context of accounts receivable. But the court in that case said that 9205, that section 9205 of the code, eliminates any requirement upon the creditor to police strictly the collateral and the proceeds in the hand of the debtor. Putting such a duty on a secured party would severely undercut significant values of certainty, efficiency, and reliance, which are at the heart of total emphasis on public filing. That's what we're talking about in this case. Prairie State did the one thing it was supposed to do. It filed a UCC financing statement. Deer Park ignored that. They were the ones with knowledge. All they would have had to do is put our names on the check or even call up and say we're doing this. And they didn't do that. And we're saying they are guilty of convergent. Negligence is not enough. Negligence is not the standard under the Uniform Commercial Code. It's not the standard under the law of convergent. It can't be. Why would any bank want to do inventory financing if their debtor could go do this secret agreement with another secured creditor and have the other secured creditor take possession of their inventory proceeds? It's outside the ordinary course of business. What he did was outside the ordinary course of business. We didn't know. It looked to us like he was operating inside the ordinary course of business. He was having a sale. That's what he's supposed to do. He didn't tell us. Deer Park didn't tell us. There is nothing in any of the documents in this case to indicate what they were up to. And we didn't know about it until it was too late to do anything about it. And that's why we're saying that this decision should be reversed. And we've proven the amount of collateral inventory proceeds specifically using their own documents. We proved the amount that they took and distributed to people having an inferior interest to us. And I guess my time is up, and I would ask the court to... Thank you. You have time for a rebuttal. Thank you.  Thank you. Please, the court. Counsel. The first sentence you just heard in the appellant's argument was that this is a case of first impression. In reality, it is a case that should never have been brought. You did not hear one case cited today, nor will you ever find one in any of the briefs, that warrants a claim like this for conversion against a consultant like my client. There is no legal authority to that effect. Judge Dimon noted that several times throughout the trial. What right did your client have to their collateral? Your client was paid for their purchase money security interest on the additional inventory that was bought. What right did your client have in the bank's collateral? The bank had a UCC filing on file. Your client was aware of it because they served him with the notice of the purchase money. Judge, my client never took possession and control of the merchant's inventory. What about the money from the sale? The proceeds went into an account that your client was the sole signatory on. Isn't that correct? That's correct. But the account itself was in the name of the merchant and owned solely by the merchant. How could the merchant take any money out of there? He was not a signatory on the account. Because under the consulting agreement, the merchant had the authority to give directions to my client as to how the money should be spent after my client was paid for its purchase money security interest and its commissions under the consulting agreement. There was over $125,000 that was available to the merchant to spend and my client was under the obligation to spend the money however the merchant directed. The merchant controlled the expenditure of the money and controlled the inventory itself. And this is the fundamental point that Judge Diamond got. He got it at the trial. And that is that there was never any default by the merchant here. What about default payment on the loan? There was no default at all. Okay. Now what's the default they're claiming? They're claiming the entry into the consulting agreement. It's interesting that you should ask that, Judge, because the default, as I understand it, the default that the bank is claiming is that by entering into this consultant agreement, the merchant violated the obligation to conduct its business in the ordinary course of business. However, if you look at the security agreement, it says that the agreement covers inventory. That's what we're dealing with in this case. I, Clouser, the merchant, will not dispose of it, the inventory, except in my ordinary course of business at the fair market value. The bank is claiming that this promise in the security agreement was violated because, as the bank relentlessly argues in its brief, because the collateral proceeds were in a bank account to which the consultant was a signatory. The fundamental mistake that the bank is making throughout this case is that this covenant in the security agreement does not make any reference, nor does it apply to the use, control, or disposition of proceeds. It only concerns selling inventory outside of the ordinary course of business, and that never occurred because the merchant was always in control of its inventory. The merchant ran the sale. The merchant's employees directed the sale. The consultant never took over the inventory. If you were the bank's lawyer leading up to all of this, what would you have directed the contract to look like? The security agreement? Yes. Well, I think this is a standard security agreement. I don't think that the problem lies in the form of the security agreement. If it is a standard security agreement, then why isn't the problem that occurred in this case, the distinction between the proceeds and the inventory that you're suggesting, one that is likely to occur in future cases or would have occurred in past cases? Well, Your Honor, I don't think it is a recurring problem because we've not had any case law ever cited by the bank with facts similar to this. So it's not become the problem. If we agree with you and Judge Dimon, why aren't we likely to see a lot more? I would submit to Your Honor, as diplomatically as I can, that the bank did not perform responsibly. One might say they were incompetent in handling and monitoring this loan. Let's say we agree with that, Counsel. They were clearly negligent. But the law is negligence doesn't defend conversion. And isn't the bottom line, no matter what the merchant did or told you to do with the money, your client knew that they had a prior security interest in the proceeds of the collateral that they gave the purchase money for. But your client ended up with everything, didn't it? Including money that they had a prior interest in. No. Well, why is that not correct? If Judge Dimon found a waiver, he's saying they waived their right, you get it. So what, didn't they have a prior interest in it? Before you find waiver? I believe you've asked several questions. One of which, you've noted that the bank acted negligently. If we want to use the word negligence, we can. I think that's not so much used as a term of art in the way we usually use it. We just mean the bank bungled it. Let's be clear here. I think that Judge Dimon's use of the phrase contributory negligence was probably imprecise insofar as it applies to an intentional tort of conversion. But I believe that the substance of his ruling is correct, because if you look very closely at Judge Dimon's ruling, he says that the court finds Perry State Bank and Trust waived its interest in the security agreement due to its contributory negligence. So while he is using a phrase contributory negligence, the focus is that they were waiving. So waiver is the issue here. What about Ms. Pogge's argument that the waiver is discussed in a particular section of the UCC and it didn't apply here? Ms. Pogge's reliance on the UCC is... 9205 in particular. Well, what she's been arguing and did much this morning is saying that we didn't know what was going on. The Deer Park never told us what was going on. They didn't tell us that they were doing what they were doing as if this is a case requiring Deer Park to give notification. This was an argument that was raised by Attorney Pogge in the closing argument at the bench trial. It's the first time that this argument of failure to notify was ever made, and Judge Dimon rightly said, wait a minute. You can't argue failure to notify. That's never been in the pleadings. This is not a case about failure to notify. This is about conversion. Furthermore, this notification obligation triggers as between joint secured creditors under 9-611 of UCC, but only after section 9-610 is met, and that is there has to be a default. So there is no notification requirement as between secured creditors until there is a default. There was never a default here. Therefore, Deer Park never had any obligation to notify the bank. Okay, let's say that's correct. Let's say there wasn't a default. Does that still give an inferior creditor, an inferior secured creditor, the right to take proceeds that belong in the first place to Prairie? How does Deer Park have the right to these proceeds ahead of Prairie? When they look at the UCC filings, they see on file there's a prior secured creditor, prior to us. Isn't it their obligation to make sure they're not taking money that belongs to them? They're entitled to their purchase money security address. They got that. Then they were getting 8% of sales and all these other commissions on top of that. Right. And they ended up with all the money in the account, didn't they? No. The merchant spent $125,000 in ways that were irresponsible, warranting this court's earlier conclusion that this merchant was not a particularly smart businessman. But he had the $125,000 left over and spent it, probably blowing it is the better word, but that was not spent by Deer Park. How much money did your client get out of the account over and above what their purchase money security interest was? What's that figure? I don't remember the exact figures, Your Honor. I know that the commissions, and I might have this backwards, the commissions for the Bloomington sales, was $8,000-something, I want to say, and for the Decatur stores, $6,000-something. And then they got a percentage of profit over and above that. I just don't recall the specific figures, though it is in the record. How much did they earn? Give us the general figure. I don't recall that for sure, Your Honor. It was six figures, but low. That's my recollection. Ms. Pogue, you mentioned $299,000 of money that was owed to the bank. Did your client get that money? That's what I'm asking. No. I want to spend a minute on this because it also gets to this issue of damages. Before these liquidation sales started, and the Bloomington store was being shut down, and the Decatur store was doing a wall-to-wall blowout sale and restocking. That was how this was designed, and that's how it went. Before that started, the inventory at the Bloomington store had a value of roughly $78,000. The other one had $80,000. The total amount of the inventory between Bloomington and Decatur was about $143,000. That's not disputed. Along with that inventory, we also know that the merchant owed $40,000 to Ashley Furniture for inventory that he purchased operating the business. You could look at this as we know that we had an inventory of $143,000, but we also had a $40,000 debt to Ashley Furniture. Now, the consultant, Deer Park, comes in, and they do this sale, and they do it really well. The merchant ends up significantly better off than when my client was in. That's even taking into account every penny and drop that was paid to Deer Park and Associates because after Deer Park and Associates was finished, the Bloomington store had closed, which the bank wanted done. They wanted it shut down. They never wanted it open in the first place. The Decatur store remained and had $60,000 of inventory in it after the sale. The merchant had netted $125,000 plus that $40,000 debt to Ashley Furniture had been wiped out. After the consultant left, after 12 weeks, the merchant has $60,000 of inventory, netted $125,000 of cash, and wiped out a $40,000 debt. If you take that picture into account and compare it to the picture that existed before the consultant came in, you will see that the merchant was in a substantially better financial position at that point than before the sale started. Judge Dimon recognized that and noted that in one of his findings, and he was absolutely right. And that's why these crocodile tears by the bank saying, well, you came in and you ravaged us. The consultant did everything that was possible to save this dying business. Was Ashley Furniture a debt that had priority over Prairie? I don't know. That's not an issue in the trial. I don't think that's everything. I want to ask you a question about the answer. I think the bank will argue that it did not. The attorney fees, $31,000 or $32,000, there was money apparently left in an account. Right. And was that the account your client was the signatory on? Right. Now how does that happen? How does your guy get judgment for attorney's fees for engaging in this litigation over the bank who had the secured interest in the proceeds from the sales? Because the contract provided for it. The contract between who? Between the merchant and Deer Park. Okay. So you have an agreement between you and the merchant. But the bank has a security interest in those funds. How do you take priority? Under the consulting agreement. The consulting agreement can't make you prior to the bank who has a prior security interest. How can that happen? I don't understand that. How does that happen? Well, Your Honor, before this case started, the complaint was filed and my co-counsel, Ken Brown, wrote a letter to the bank's counsel stating that there is no basis for this claim. Please withdraw it and we can send you the $30,000, $31,000 that's in the account. But if you proceed with the litigation, then under the terms of the consulting agreement brought, that can be used for defense of this ill-gotten suit. But your agreement was with Clauser who's now bankrupt. Right? So what's your agreement worth with him? Nothing. These funds that were still sitting there, in my mind, at least the way I looked at it, was the bank's money, not yours. So I don't understand how Judge Steinman was able to provide that to you. And I haven't heard anything yet that convinces me otherwise. Well, Your Honor, the... You can't agree. In other words, what I'm saying is the fact that you made a contract with somebody else to take the bank's money means nothing. You had an agreement with them that they would pay your attorney's fees, but that money sitting there is subject to a priority. He might have the obligation to you, but that doesn't give you the right to take the bank's money. That's the point I'm getting at. And if you could explain to me how you can accomplish that, other than the fact that it actually happened in this case, I'd be pleased to know. Right. Well, that... I will tell the Court that that was not an issue raised in our briefs. Well, I think it's in this Court's brief. Well, insofar as she makes the blanket argument that the proceeds from the sale... the bank was entitled to the proceeds from the sale as a whole, and that's been the argument. And, Judge, let me be quick to follow up here. Because this is a case that should not have been brought, plus a very serious matter that occurred in the trial court, and that was an affidavit was signed by the loan officer that had charge of this loan, signed an affidavit that was tendered to the Court that one could say was just a fat lie to the Court. Being charitable, it was a significant misrepresentation to the Court. It was an affidavit by John Roan, which said that neither he nor his boss, Mr. Hall, had received a flyer in the mail notifying them of this inventory sale. At trial, John Roan admitted under oath, Oh yeah, we got that flyer. We got that in April or in May. Hall sought either a handout flyer or something in the newspaper. The bottom line is that John Roan had simply disputed Clouser's affidavit. Clouser said, look, I gave Roan and I gave Hall... sent them a flyer in the mail. They knew about all this liquidation sale. And Roan says, well, we didn't get anything in the mail. Well, that may be true, right? But he got the flyer, Your Honor, and the point of the affidavit was to suggest to the Court, I didn't know about this. That was the whole tenor of the affidavit. And while we can say it was, if we get down to the microscopic level, it was technically true he didn't get it in the mail, the intent was to say to the Court, I didn't get this flyer. Well, it also might be saying, Clouser has said he mailed this to us. We didn't get anything in the mail. I thought from my reading Hall was somewhere and picked it up off of a stand somewhere and saw it and brought it into the bank and said, look, did you know this was going on? So they knew, Judge. Right, I get that. But not because Clouser notified them by mail. But Clouser did notify him, Judge, because once they got that flyer, then John Roan had a conversation, called Clouser, this too was part of the trial record, and said, hey, we see these flyers talking about this liquidation sale. Tell me what's going on. Clouser says, this is what's going on. I'm liquidating the Bloomington store and shutting it down. Roan says, that's good. We never wanted that to open in the first place. And then he says, I'm doing a wall-to-wall restocking of the Decatur store. Roan said, great. And all of this happened, and so Roan saw the flyer. Then he had a conversation with Clouser, and he knew well early into this, it was late April or early May, right soon after this thing started, he knew about this and was fine with it. Your time's up, Counsel, but I have a quick question I want to ask you before you're done, and that is, with regard to what you just said, how is it pertinent to the question Justice Pope raised about the $31,000 in attorney fees? Well, the point of my stating that, Judge, is above and beyond the consulting agreement. This is a case that, because of deliberate misleading of the court, I believe should entitle my client, the consultant, to sanctions. Of course, Judge Diamond denied that. He did. So short of sanctions, what does your response have to do with the $31,000 in attorney fees? Well, the consulting agreement, I believe, entitles them to that under the terms of the agreement. Thank you, Counsel. Ms. Pogge, any rebuttal? Yes, Your Honor, just briefly. The point of the affidavit was because Prairie State wanted to clarify, it didn't get anything in the mail. Nobody made any effort to notify them of this. Jim Hall stumbled onto this notice of the sale. We wanted to make it clear nobody made any effort to notify us about the sale because they did not. And, of course, nobody made any effort to tell us about Deer Park's involvement. As to the damages, Your Honor, we are saying, and we specify the damages. They're in our brief. They're in Exhibit O that was produced at trial. These damages were taken from documents, sale documents, that Deer Park prepared sale accountings. And they list specifically the amounts that we are saying belonged to Prairie State and which Deer Park distributed to other people. Ashley Furniture, and it is in the record, Your Honor, there is an exhibit in the record, a UCC search. Ashley Furniture is nowhere in there. So the $40,000 that was given to Ashley Furniture, they were an unsecured creditor who got our money. The payments to Just Sofas should have come to Prairie State because they were in default. Prairie State had the prior right to possession. Deer Park, the number, the $33,000 that this court asked about is also in that $299,000 number. So are you saying, like, the payment to Ashley is a default? Well, no. I'm saying the payment, well, yes, the payment to Ashley. The default occurred as soon as Just Sofas signed that consulting agreement that gave Deer Park the right to take our collateral proceeds into their possession. That was the default. It would have been okay to repay Ashley if business was still being conducted in the ordinary courts. If Just Sofas would have done it. But that's the thing. Deer Park is acting like it was Just Sofas' agent. It is crystal clear from that consulting agreement that they are not. It says in several different places, we are not your agent. They made that crystal clear. They admitted that in their briefs. They admitted that at trial. Deer Park was not acting as Just Sofas' agent. So Just Sofas doesn't have the power of direction. Deer Park testified, admitted at trial. They took those proceeds to protect their purchase money security interest. They were acting as a secured creditor when they did that. And I think the court even recognized this in its sanctions order when he said that they were basically wearing two hats. They were a consultant and they were a secured creditor. The default came in because they were acting as a secured creditor. They took possession. They distributed. They should have distributed to Prairie State. Do you agree with Mr. Jackson that the failure to notify was not pled other than? It's implied. Implied in the conversion? It's in the conversion. It's like taking your car. Somebody takes my car and they don't get my permission. It's implied. I wasn't arguing in a separate. I'm saying the commercial code. It's kind of a philosophy of the commercial code. That's why you have UCC financing statements is so everybody knows where everybody else is. Deer Park knew about us. They were the ones that had the opportunity, that had the knowledge. All they would have had to do was say, we're doing this or put our names on the check. If they would have put our names on the check and Prairie State would have signed off on them, that's waiver. But nothing we did not knowing was waiver. Nothing was waiver. It was negligence, not waiver. Thank you, Counsel. We'll take this matter under advisement and be at recess.